IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TAFARA WILLIAMS, individually and as next,   )
friend of M.S., a minor   )
   )
       Plaintiff,   )      Case No. 20 C 6409
   )
    v.   )
   )      Judge Robert W. Gettleman
THE CITY OF WAUKEGAN, a municipal   )
corporation; DANTE SALINAS, individually and   )
in his official capacity; and JAMES KEATING,   )
individually and in his official capacity,   )
   )
       Defendants.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Tafara Williams has (on behalf of herself and the estate of Marcellis Stinnette) sued the City of Waukegan, along with Waukegan Police Officers, Dante Salinas and James Keating (in their individual and official capacities), under 42 U.S.C. § 1983 for violating plaintiff's and Stinnette's federal constitutional rights. According to plaintiff's operative Fourth Amended Complaint, she and Stinnette were parked in a car in front of plaintiff's home in Waukegan, when Officer Keating approached them, questioned them, and eventually physically restricted Stinnette. At that point, she alleges, she pulled away from the curb. Officer Keating then falsely reported to police dispatch that she had "just [run him] over." In response, Officer Salinas pursued plaintiff's vehicle. At some point, he got out of his vehicle, drew his gun, and fired five shots into plaintiff's vehicle hitting both occupants and killing Stinnette. Yet at no time did either officer have any reason to believe that a violent crime had been committed or that anyone was in serious danger.

Plaintiff thus filed this lawsuit. The operative complaint asserts seven counts: a claim against Officer Salinas for excessive force under § 1983 (Count I); a claim against Officer Salinas for wrongful death under Illinois' Wrongful Death Act, 740 ILCS 180 (Count II); a "survival action" against Officer Salinas under Illinois' Survival Act, 755 ILCS 5/27 (Count III); a Monell claim against Waukegan (and its Chief of Police, Wayne Walles)[1] under § 1983 (Count IV); a claim against Waukegan (and Chief Walles) for negligent hiring, training, and supervision under § 1983 (Count V); a claim for false arrest against Officer Keating (Count VI); and a claim for indemnification against Waukegan under 745 ILCS 10/9-102 (Count VII). Waukegan and Chief Walles have moved to dismiss Counts IV and V, to dismiss all official capacity claims, and to dismiss Chief Walles from the case under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the below reasons, the court grants in part and denies in part the motion.

## BACKGROUND

### Factual Background

Plaintiff alleges the following facts in her complaint, which are taken as true in resolving defendant's motion. Alam v. Miller Brewing Co., 709 F.3d 662, 665-66 (7th Cir. 2013). Plaintiff resides in Waukegan, Illinois. She has been appointed an Independent Administrator of the Estate of Stinnette. On October 20, 2020, plaintiff was seated in the driver's seat of a car parked in front of her home in Waukegan. Stinnette was seated in the passenger seat beside her.

At some point, Officer Keating stopped his police vehicle, exited it, approached plaintiff and Stinnette's vehicle, demanded their names, and began to question them. At no point leading

---

[1] Chief Walles is not identified in the complaint's caption or in the section of the complaint titled, "Parties." As further explained below, the court dismisses him from the case.

2

up to his doing so did he see a weapon in their possession, did he see either committing a crime, or did he have any reasonable suspicion, probable cause, or any other legal reason to detain them.

During the encounter, Officer Keating physically restricted Stinnette, at which point plaintiff pulled away in the car from the curb. Officer Keating responded by falsely reporting to dispatch: "Hey, they just ran me over." In so doing, he also reported plaintiff's and Stinnette's names to dispatch to alert other officers, including Officer Salinas, who, "in conjunction with" Officer Keating, began pursuing plaintiff's vehicle.

Officer Salinas thereafter exited his vehicle with gun drawn (and without turning on his body camera before doing so), and fired his gun five times into the front and driver's side of plaintiff's vehicle. At no point in time, however, did Officers Salinas and Keating have "any information that any violent crime had been committed [or] that they or any other individuals were in danger of death or serious bodily harm." So deadly force was unjustified.

Plaintiff thereafter "[c]ried for help and indicted that she and [Stinnette] had been shot," but the "officers did not respond with aid." Officer Salinas instead turned on his body camera and yelled: "I was right behind you and you almost tried to run me over." Eventually, Stinnette "was pulled from the vehicle and laid on the ground." He "waited on scene for an ambulance and did not receive medical assistance for over eight minutes, while he bled out on the ground." He ultimately died from his injuries. As a result, Officer Salinas was charged with three counts of Second-Degree Murder and one count of Involuntary Manslaughter in Lake County, Illinois.

And as a "direct and proximate result of the actions of one or more defendants, Officer Salinas, Officer Keating, the City of Waukegan, and Police Chief Wayne Walles," plaintiff and

3

Stinnette suffered damages.    Indeed, defendants' actions interfered and interrupted Stinnette's liberty interest without due process of law and caused him pain and suffering.    And plaintiff "experienced injuries, including physical and psychological pain and suffering, disfigurement, disability, and loss of a normal life, and incurred medical bills."

## Procedural Background

Plaintiff—individually and as the administrator of Stinnette's estate—filed this lawsuit. The court has generally stayed the case pending related criminal proceedings, but allowed plaintiff to file the operative complaint, which as explained above, asserts seven counts, including three against the city—a Monell claim against Waukegan and Chief Walles under § 1983 (Count IV); a claim against Waukegan and Walles for negligent hiring, training, and supervision under §1983 (Count V); and a claim for indemnification against Waukegan under 745 ILCS 10/9-102 (Count VII).

Waukegan filed an answer to Count VII, but did not answer Counts IV and V.    It (along with Chief Walles) instead moved to dismiss Counts IV and V and to dismiss all official capacity claims (and Chief Walles altogether) under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## DISCUSSION

Rule 12(b)(6) provides for dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted."    Fed. R. Civ. P. 12(b)(6).    Rule 8 "prescribes the information [that] a plaintiff must present about the merits of his claim at the outset of litigation: 'a short and plain statement of the claim showing that [he] is entitled to relief.'"    Berk v. Choy, 607 U.S. 187, 193 (2026) (quoting Fed. R. Civ. P. 8(a)(2) (second bracket in original)).    So to rule on a Rule 12(b)(6) motion, the court must determine whether the plaintiff has adequately presented a

4

statement of the claim that shows entitlement to relief.

To do so, the court "asks only whether the complaint's factual allegations, if taken as true, 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." Id. at 679 (cleaned up). In other words, a claim for relief "cannot be merely conceivable or speculative." Taylor v. Salvation Army Nat'l Corp., 110 F.4th 1017, 1028 (7th Cir. 2024). The plaintiff must instead "present a story that holds together"—with "sufficient details to make the plaintiff['s] account one that *could* have happened and, if it did happen, states a claim cognizable under the governing law." Id. (cleaned up) (emphasis in original).

In determining whether the plaintiff has presented such a story, the court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Alam, 709 F.3d at 666 (citation omitted). Put simply: "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). The court may also "consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." Williamson v. Curran, 714 F.3d 432, 436 (7th Cir. 2013). And "a party opposing a Rule 12(b)(6) motion may submit materials

5

outside the pleadings to illustrate the facts the party expects to be able to prove." Geinosky v. City of Chi., 675 F.3d 743, 745 n.1 (7th Cir. 2012).

In the end, the "plausibility" "principle does not, and under the strictures of Rule 8 cannot, present a high barrier to the pleader." Taylor, 110 F.4th at 1028. As the Supreme Court put it in Berk: "By design, this system of pleading makes it relatively easy for plaintiffs to subject defendants to discovery—even for claims that are likely to fail." 607 U.S. at 194. The Court therefore admonished lower federal courts not to attempt "[t]o protect defendants from this burden" by "tr[ying] to require more information for certain kinds of claims," as the Court has "consistently rejected such efforts." Id. The Court thus concluded: "Unless the Federal Rules single out a claim for special treatment, see, *e.g.*, [Rule] 9, Rule 8 sets a ceiling on the information that plaintiffs can be required to provide about the merits of their claims." Id.

With these principles in mind, the court turns to the relevant counts.

### Count IV

In Count IV, plaintiff asserts a "*Monell* Claim" against Waukegan and Chief Walles under § 1983. Section 1983 provides a cause of action against a person, who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws of the United States." Livadas v. Bradshaw, 512 U.S. 107, 132 (1994) (cleaned up). It provides the procedural vehicle "for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation omitted). To establish a § 1983 claim, a plaintiff must prove two things: (1) that "the conduct complained of was committed by a person acting under color of state law"; and (2) that "this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United

6

States." Strasburger v. Bd. of Educ., Hardin Cnty. Cmty. Unit Sch. Dist. No. 1, 143 F.3d 351, 355 (7th Cir. 1998) (citation omitted).

The Supreme Court long ago held in Monell v. Dep't of Social Servs., 436 U.S. 658 (1978), that a municipality is a "person" who may be sued under § 1983. Thomas v. Neenah Joint Sch. Dist., 74 F.4th 521, 523 (7th Cir. 2023). But there is a caveat: a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell, 436 U.S. at 694 (emphasis added). In other words, municipalities "cannot be held vicariously liable for the constitutional torts of their employees," and can instead "be sued only for their own violations of federal law." Thomas, 74 F.4th at 523. This means that a "government as an entity is responsible under § 1983" only when "the execution of a government's policy or custom"—"whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy"—is what "inflicts the injury" on the plaintiff. Monell, 436 U.S. at 694.

In "the wake of *Monell*," a "highly complex body of interpretive law on when plaintiffs can establish a municipal policy or custom developed." Mendoza v. City of Chi., No. 23 CV 2441, 2026 WL 1693582, at *2 (N.D. Ill. June 11, 2026) (cleaned up). This has led to the current Seventh Circuit framework, under which, to establish a § 1983 Monell claim against a municipality, a plaintiff must prove: (1) that she was deprived of a constitutional right; (2) that the deprivation can be traced "to some municipal action" or inaction "(i.e., 'a policy or custom'), such that the challenged conduct is properly attributable to the municipality itself,"; (3) that "the policy or custom demonstrates municipal fault, i.e., deliberate indifference"; and (4) that the municipal action or inaction "was the moving force behind the federal-rights violation." Dean

7

v. Wexford Health Sources, Inc., 18 F.4th 214, 235 (7th Cir. 2021) (cleaned up); see also Thomas, 74 F.4th at 524. All four elements "must be scrupulously applied to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability." Thomas, 74 F.4th at 524.

In moving to dismiss Count IV, Waukegan and Walles do not dispute that plaintiff has plausibly pleaded the first element—that she and Stinnette were deprived of their Fourth Amendment rights to be free from unreasonable stops and excessive force. They instead assert that plaintiff has failed to plausibly plead the second element—that a Waukegan policy or custom caused the constitutional deprivation.

### Whether Plaintiff has Plausibly Alleged a Waukegan Policy or Custom

The policy-or-custom requirement is "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality and to limit liability to action for which the municipality is actually responsible." Bradley v. Vill. of Univ. Park, Ill., 929 F.3d 875, 884 (7th Cir. 2019) (cleaned up) (emphasis in original). "The critical question under *Monell*," then, "is whether a municipal . . . policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 379 (7th Cir. 2017) (en banc).

To show that a municipal policy gave rise to the harm, a plaintiff "must show that the tort was committed (that is, authorized or directed) at the policymaking level of government—by the city council, for example, rather than by the police officer who made an illegal arrest." Vodak v. City of Chi., 639 F.3d 738, 747 (7th Cir. 2011); see also Glisson, 849 F.3d at 381 (reframing the "critical question under *Monell*" as: "is the action about which the plaintiff is complaining

8

one of the institution itself, or is it merely one undertaken by a subordinate actor?"). To establish that the tort was committed at the policymaking level, a plaintiff generally must show that the constitutional deprivation was caused in one of three ways: (1) by "an express policy"; (2) by "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice"; or (3) by an act of "a person with final policymaking authority." Thomas, 74 F.4th at 524 (citation omitted); see also Betts v. Boone Cnty., Illinois, 178 F.4th 1051, 1056 (7th Cir. 2026). Courts have also recognized a fourth way: showing that the deprivation was caused by "the municipality fail[ing] to properly screen, hire, train, or supervise its employees." Mendoza, 2026 WL 1693582, at *2.

In Count IV, plaintiff relies on the second way—a widespread practice. She alleges that Waukegan "policymakers . . . accepted the pattern and practice among its police officers of disregarding the requirement for a finding of reasonable suspicion prior to effectuating a stop and for using excessive force and unconstitutional police tactics." In doing so, she alleges, they "created a practice, although not written or express municipal policy, so widespread, permanent, and settled" that "it constituted a custom or usage within the Waukegan Police Department." She further alleges that this "custom or usage of excessive force during the arrest [and] detention of accused individuals" caused the violation of her and Stinnette's constitutional rights to be free from unreasonable stops and excessive force.

In moving to dismiss, Waukegan argues that Count IV "simply recites a boilerplate allegation that the Village had a 'pattern or practice' of disregarding the Fourth Amendment requirement of reasonable suspicion for traffic stops and avoiding excessive force." But, they say, "recitals of the elements of a cause of action, supported by mere conclusory statements, do

9

not suffice." (Quoting Iqbal, 556 U.S. at 678). At most, they continue, plaintiff "tacks on legal conclusions and rote incantations of *Monell*'s elements to . . . her own experience."

In response, plaintiff asserts that "Count IV states a *Monell* claim grounded in Waukegan's pattern and practice." She argues that there is "no heightened pleading standard for *Monell* claims," and that the complaint provides "detailed factual allegations" that "Waukegan engaged in a pattern and practice among its police officers of disregarding citizens' Fourth Amendment rights." According to plaintiff, the complaint elsewhere "provides extensive factual support for these" allegations by detailing Officer Keating's and Officer Salinas's violations of plaintiff's and Stinnette's Fourth Amendment rights in "rapid succession." In addition, she contends, the complaint alleges (albeit in Count V) that Salinas was also involved in "a 2019 incident so severe that he was convicted of a felony for this prior Fourth Amendment violation." "These are not mere legal conclusions tacked onto the plaintiff's experience," she concludes; "they are specific facts from which the Court can reasonably infer the existence of a pattern or practice based on the conduct of two Waukegan police officers, including an incident that entirely pre-dates the officers' involvement with Plaintiff."

The court disagrees with plaintiff. A widespread custom or practice for Monell purposes refers to a practice "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." Daniel v. Cook Cnty., 833 F.3d 728, 734 (7th Cir. 2016) (cleaned up). "Although th[e] [Seventh Circuit] has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident— or even three incidents—do not suffice." Wilson v. Cook Cnty, 742 F.3d 775, 780 (7th Cir. 2014). And for other incidents to matter, they must be sufficiently similar to support an

10

inference of a broader pattern.   See, e.g., Howell v. Wexford Health Sources, Inc., 987 F.3d 647, 657 (7th Cir. 2021) (explaining that "the comparator[s] need not be perfect" but the "similarities" must be sufficient to "show a widespread practice").

True, as plaintiff suggests, this is only the pleading stage, and at this stage, Rule 8(a)—not some heightened standard—applies to causes of action for municipal liability.   White v. City of Chi., 829 F.3d 837, 843-44 (7th Cir. 2016).   But even under the Rule 8(a) standard, the plaintiff "must allege facts permitting a reasonable inference that the practice is widespread and that the specific violations complained of were not isolated incidents."   Thomas, 74 F.4th at 524 (cleaned up).   Generally, "[a]llegations of a few sporadic examples of an improper behavior will not suffice."   Id. (cleaned up); see also id. at 525 ("Thomas's allegations of two isolated incidents fail to plausibly allege that the District has a widespread practice of using excessive force to punish students with behavioral disabilities"); Flores v. City of South Bend, 997 F.3d 725, 733 (7th Cir. 2021) ("Allegations that officers sometimes drive at high rates of speed," including allegations of three specific examples of one officer speeding, failed to plausibly suggest that the city had a widespread practice of allowing officers to speed).

But that is not to say that a plaintiff must always "identify every other or even one other individual" who has been injured from the alleged widespread practice to survive a motion to dismiss.   White, 829 F.3d at 844.   In White, for example, the plaintiff premised the Monell claim on an arrest executed based on an incomplete arrest warrant that lacked factual information about the basis for probable cause.   Id. at 840-41.   In addition to alleging in the complaint that the police officer who arrested him asked a judge for a warrant without any evidence of a drug-related offense, the plaintiff also alleged that the police department used a "standard printed form

11

that does not require specific factual support for an application for an arrest warrant." Id. at 844. The Seventh Circuit held that the plaintiff's individual incident "[t]ogether with" the standard printed form was enough to allege a Monell claim. Id.

The court finds that plaintiff fails to plead enough facts to support a plausible inference that Waukegan had a widespread custom of lacking reasonable suspicion before making stops and of using excessive force. Indeed, the complaint alleges facts about just two incidents: (1) the October 20, 2020 incident in which Officer Keating and Officer Salinas violated plaintiff's and Stinnette's Fourth Amendment rights; and (2) an August 31, 2019 incident in which Officer Salinas "used excessive force and violated the constitutional rights of another Waukegan resident."[2] And the same officer (Salinas) was involved in both. And although a second officer (Keating) was also involved in the 2020 incident, that incident was all one, continuous incident.

Plaintiff's "allegations of two isolated incidents fail to plausibly allege that [Waukegan] has a widespread practice of using excessive force" or of lacking reasonable suspicion for stops. Thomas, 74 F.4th at 525. To "find[ ] otherwise would stretch the law too far, opening municipalities to liability for noncodified customs in all but the rarest of occasions, as long as a plaintiff can find a few sporadic examples of an improper behavior." Flores, 997 F.3d at 733 ("[a]llegations that officers sometimes drive at high rates of speed" was insufficient to support a

---

[2] Plaintiff attaches to her response brief (without objection from Waukegan) a copy of a news article and a copy of Officer Salinas's "Order and Certificate of Felony Probation," which explains that Salinas was found guilty of a Class 3 felony based on the 2019 incident, and which the court may consider on a Rule 12(b)(6) motion. See Geinosky, 675 F.3d at 745 n.1 ("a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove").

de facto policy claim). Nor has plaintiff alleged any other factual matter that—when coupled with the two incidents—could move the widespread-custom allegation from conceivable to plausible. Compare White, 829 F.3d at 844 (plaintiff's specific incident coupled with the city's standard printed form plausibly suggested that the practice was common).

Because plaintiff's complaint fails to plausibly plead that Waukegan had a widespread custom of lacking reasonable suspicion and of using excessive force, the court grants Waukegan's motion to dismiss Count IV.

### Count V

In Count V, plaintiff asserts that Waukegan and Chief Walles violated § 1983 based on negligent hiring, training, and supervision. As noted above, one way in which a municipality can be held liable under § 1983 is by showing that the municipality failed "to properly screen, hire, train, or supervise its employees." Mendoza, 2026 WL 1693582, at *2. This theory has grown out of three Supreme Court cases.

Starting with City of Canton, Ohio v. Harris, 489 U.S. 378 (1989), the Supreme Court held that, "consistent" with Monell, "the inadequacy of police training may serve as the basis for § 1983 liability." Id. at 388. But, the Court cautioned, liability attaches "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. According to the Court: "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 389. "In effect, by failing to train an employee whose conduct the municipality knows to be deliberately indifferent to the public, the municipality itself

13

demonstrates deliberate indifference to that known risk." Flores, 997 F.3d at 731 (discussing Canton).

Roughly a decade later, "the Court imported Canton's failure-to-train principles into the hiring context in *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997)." J.K.J. v. Polk Cnty., 960 F.3d 367, 398 (7th Cir. 2020) (Brennan, J., dissenting in part). In Brown, the plaintiff had sued a county under § 1983, alleging that one of its police officers had used excessive force in arresting her when he used an "arm bar" technique in which he grabbed her arm, pulled her from the vehicle, and spun her to the ground. 520 U.S. at 399-401. The plaintiff further alleged that the county was liable for the injuries she sustained based on the county sheriff's hiring and training decisions. Id. at 400. After the county was found liable in the lower courts, the Court granted certiorari "to decide whether the county was properly held liable for [her] injuries based on [the sheriff]'s single decision to hire [the officer in question]." Id. at 402. The Court ultimately held that, "[e]ven assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability, the evidence . . . was insufficient to support a finding that, in hiring [the officer]," the county was liable for plaintiff's injuries. Id. at 412.

In doing so, the Court drew from Canton's "deliberate indifference" standard and held that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" Id. at 411. According to the Court, "a finding of culpability simply cannot depend on the mere

14

probability that any officer inadequately screened will inflict any constitutional injury"; "it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." Id. at 412 (emphasis in original). "In other words, a plaintiff must connect the dots between the past conduct and the specific constitutional violation." Wilson, 742 F.3d at 783 (discussing Brown).

In finding that the county was not liable in the case before it, the Court explained that, before the sheriff hired him, the officer had been "charged with assault and battery, resisting arrest, and public drunkenness" arising out of a fight on a college campus when the officer was a college student, and that he had also pleaded guilty to some traffic offenses. Brown, 520 U.S. at 413-14. Although that conduct "may well have made him an extremely poor candidate for" the police, id. at 414, the Court concluded that it was "insufficient" to show that the sheriff's "decision to hire [him] reflected conscious disregard of an obvious risk that a use of excessive force would follow," id. at 15.

More than a decade after Brown, the Court again revisited the "failure-to-train" theory in Connick v. Thompson, 563 U.S. 51 (2011). The plaintiff there alleged that a district attorney's office was liable under § 1983 for failing "to train his prosecutors adequately about their duty to produce exculpatory evidence and that the lack of training had caused the nondisclosure in [his] robbery case." 563 U.S. at 54. The Court held that the district attorney's office was not liable. Id. In doing so, the Court recognized two types of inadequate training claims: (1) a "pattern of similar constitutional violations" claim, and (2) a "single-incident" claim. Id. at 62-64. For a pattern claim, a plaintiff must prove a "pattern of similar constitutional violations by untrained employees." Id. at 62. A "pattern" means prior violations "similar to" the specific violation

15

suffered by the plaintiff.   Id. at 63; Flores, 997 F.3d at 731 ("a municipality's 'decision not to train certain employees,' despite actual or constructive notice that their actions constitute deliberate indifference to the rights of the public with whom they come into contact, is the 'functional equivalent of a decision by the city itself to violate the Constitution.'" (quoting Connick, 563 U.S. at 61)).

For a "single-incident" claim—that is, where the plaintiff's own incident is the only rights-violating incident alleged—a plaintiff must show that the risk of the constitutional violation was so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare employees for it.   Connick, 563 U.S. at 63-64.   For example, "a single violation can suffice where a violation occurs and the plaintiff asserts a recurring, obvious risk."   Flores, 997 F.3d at 731.   A "hypothetical example" of this would be "a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."   Connick, 563 U.S. at 63.

Here, the allegations of Count V fall somewhere in the middle of these cases.   Plaintiff alleges in Count V that Waukegan and Chief Walles "breached their duties to hire only qualified employees for the tasks they were assigned, train them properly in the performance of their duties, and provide proper supervision and guidance to their employees in their assigned duties." That is because, plaintiff alleges, "they failed to do appropriate background checks [and] psychological testing[,] failed to be present to supervise the activities of officers, mistreated or reassigned supervisors who complained about the actions of officers including the excessive force, and allowed officers who did not perform up to standards during field training to be placed

16

on the street." Plaintiff further alleges that Waukegan and Chief Walles also "knew that [Salinas] had a propensity to escalate confrontations into hazardous situations, and in fact, did so when," during the August 2019 incident, "he used excessive force and violated the constitutional rights of another Waukegan resident." Yet "they took no action against" Salinas and kept him on the force. Because they "fail[ed] to adequately train, prepare, and equip" Salinas, plaintiff's and Stinnette's rights were violated.

Waukegan argues that Count V should be dismissed. According to Waukegan, plaintiff "does not allege any factual content connecting any specific hiring decision, let alone a widespread practice of hiring bad officers, to the injuries she or Stinnette sustained." And the "'failure to train' and 'failure to supervise' allegations are nothing more than a bare bones recitation of a category of potential Monell liability." So, Waukegan argues, Count V should be dismissed.

The court disagrees. While close, the court finds that plaintiff has pleaded enough here to survive dismissal. Indeed, she has pleaded enough at this stage to plausibly allege at least a failure to properly hire (or in this case retain) claim—that is, a claim that Salinas's prior conduct would have led "a reasonable policymaker to conclude that the plainly obvious consequence of the decision to [retain Salinas] would be the deprivation of a third party's federally protected right." Brown, 520 U.S. at 411; see also Gomez v. Galman, 18 F.4th 769, 778 (5th Cir. 2021) (recognizing that a "City may be held liable for decisions about hiring and retention if [the plaintiff] can demonstrate 'deliberate indifference' to the 'known or obvious consequence[s]' of such decisions." (quoting Brown, 520 U.S. at 410) (emphasis added)). That is because plaintiff has plausibly pleaded that Waukegan had actual or constructive notice that Officer Salinas "was

17

highly likely to inflict the *particular* injury suffered by the plaintiff." Brown, 520 U.S. at 412 (emphasis in original). Or stated otherwise, plaintiff has sufficiently "connect[ed] the dots between the past conduct and the specific constitutional violation." Wilson, 742 F.3d at 783.

As for the past conduct, plaintiff alleges in her complaint that in 2019, Officer Salinas "used excessive force and violated the constitutional rights of another Waukegan resident." And in her response brief, she provides more detail about that incident. First, as noted above, she cites a news article. The article explains that "Salinas stopped at a Waukegan home, where a couple dozen family members and friends were celebrating, after reportedly hearing loud noise coming from the yard." See https://abc7chicago.com/post/former-waukegan-police-department-officer-dante-salinas-sentenced-60-days-jail-2-years-probation-misconduct-case/18081933/. Salinas then "pulled out [his] gun within moments of getting out of his squad car," confronted "a man at the party," "switched to a Taser," "fir[ed] the Taser at [the man] several times," and then "punched [the man] in the face, breaking his eye socket." Id. The article explains that the judge presiding over Salinas's criminal bench trial found Salinas guilty of battery and official misconduct, and stated that Salinas's actions were unjustified, and that he could not "remember a time [he] saw an officer resort to striking (a suspect) this quickly." Id. Second, as explained above, plaintiff also attaches to her response brief a copy of an "Order and Certificate of Felony Probation," which explains that Salinas was found guilty of a Class 3 felony based on the 2019 incident.[3]

Yet even though Waukegan and Walles knew about this incident, plaintiff alleges, they took no action against Salinas and retained him. She further alleges that as a general matter,

---

[3] Again, the court may consider the order and article here. See Geinosky, 675 F.3d at 745 n.1.

18

their training and discipline of officers was lacking: Waukegan failed to perform "psychological testing," failed to "supervise the activities of officers," "mistreated or reassigned supervisors who complained about the actions of officers including the excessive force, and allowed officers who did not perform up to standards during field training to be placed on the street."

As for the specific constitutional violation that plaintiff and Stinnette endured, plaintiff alleges in the complaint that a year after the 2019 incident, Officer Salinas, without having "any information that any violent crime had been committed [or] that they or any other individuals were in danger of death or serious bodily harm," exited his vehicle with his gun drawn, and fired his gun five times into the front and driver's side of plaintiff's vehicle. By failing to "adequately train, prepare, and equip" Salinas, plaintiff further avers, Stinnette's and her fourth amendment rights were violated.

Plaintiff has thus sufficiently pleaded a strong causal connection between Salinas's past conduct (Salinas drawing his gun moments after getting out of his squad car, firing a weapon several times at a suspect, and breaking the suspect's eye socket) and the specific constitutional violation plaintiff has alleged here (Salinas drawing his gun immediately after getting out of squad car, and firing several shots into plaintiff's vehicle). This is simply not like the tenuous connection in Brown, for example, where the officer's past conduct (the officer committing assault and battery during a campus fight while he was a college student) bore little similarity to specific constitutional violation at issue there (the officer using excessive force in arresting the plaintiff during a police traffic stop). 520 U.S. at 413-14. Put simply, "[t]he connection between the background of the particular [officer] and the specific constitutional violation

19

alleged" here is much "strong[er]" than it was in <u>Brown</u>. <u>Id.</u> at 412.

In short, and "[s]tressing that we are still at the pleading stage," the court "conclude[s] that [plaintiff]'s complaint plausibly alleges that the City acted with deliberate indifference by failing to address the known recklessness of" Salinas. <u>Flores</u>, 997 F.3d at 733 (reversing dismissal of <u>Monell</u> claim that was based on a "failure-to-train theory" where the city was aware that the police officer who killed the plaintiff by driving recklessly had previously driven "in the dark of night at extreme speeds"). By alleging that Waukegan failed to train, discipline, or fire Salinas—"an employee whose conduct the municipality kn[ew] to [have] be[en] deliberately indifferent to the public," <u>id.</u> at 731—plaintiff has plausibly alleged that "the municipality itself demonstrate[d] deliberate indifference to that known risk." <u>Id.</u> The court "of course offer[s] no opinion on the way this case will look after all parties have had the chance to develop the factual record further." <u>Id.</u> at 734. The court thus denies Waukegan's motion to dismiss Count V.

### Whether to dismiss the Official Capacity Claims

Waukegan argues that the official capacity claims against Chief Walles, Officer Keating, and Officer Salinas should be dismissed. According to Waukegan, when a plaintiff alleges both a <u>Monell</u> claim and official capacity claims against an alleged policymaker and the police officers, the official capacity claims are dismissed as duplicative. Waukegan further argues that "Chief Walles is sued only in his official capacity," and that "there is no other basis to keep [him] in this case," noting that he "is not even listed in the caption of the Fourth Amended Complaint."

In response, plaintiff states in a single sentence that she "agrees with Defendants that the official capacity claims against Officers Salinas, Keating, and Chief Walles are redundant to the

20

*Monell* claims against the City and should be dismissed *without prejudice*." (Emphasis by plaintiff). Plaintiff does not respond to Waukegan's argument that the court should dismiss Chief Walles entirely from the case.

Waukegan and Walles argue in reply that the court "should dismiss Walles and all official capacity claims with prejudice."

The court dismisses the official capacity claims against Walles, Keating, and Salinas with prejudice. Sanders v. Splittorf, No. 17-CV-00864-JPG, 2023 WL 2374370, at *3 (S.D. Ill. Mar. 6, 2023) ("The *Monell* claim against Splittorff and O'Neill, in their official capacities, shall . . . be dismissed with prejudice," because the plaintiff "already named the City of Alton in connection with the *Monell* claim, so including official capacity claims against the officers adds nothing"). Because the only claims against Chief Walles are official capacity claims, he is dismissed from the case.

**CONCLUSION**

For the above reasons, the court grants in part and denies in part defendant Waukegan's motion to dismiss [187]. The court grants Waukegan's motion to dismiss Count IV, and dismisses the claim without prejudice. The court also grants the motion as to the official capacity claims, and dismisses with prejudice the official capacity claims against Chief Walles, Officer Keating, and Officer Salinas, and dismisses Chief Walles from the case. The court denies Waukegan's motion to dismiss Count V. Waukegan is directed to file its answer to Count V by August 20, 2026.

So ordered.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:   July 29, 2026**

22